UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

TERION COLLINS,

              Plaintiff,

    v.

HEATHER SHIRLEY, et al.,

              Defendants.

Case No.: 1:23-cv-00483 CDB (PC)

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

(Doc. 44)

Plaintiff Terion Collins is proceeding pro se and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.

## I.    INTRODUCTION[1]

The Court issued its Discovery and Scheduling Order on January 11, 2024. (Doc. 35.)

On January 17, 2025, Defendants filed a timely motion for summary judgment. (Doc. 44.) Defendants' motion included a *Rand*[2] warning (Doc. 44-9), specifically addressing the requirements concerning an opposition to a motion for summary judgment.

On February 18, 2025, when more than 21 days without Plaintiff filing an opposition or statement of non-opposition to Defendants' motion, the Court issued its Order to Show Cause

---

[1] All parties have consented to the jurisdiction of the assigned magistrate judge for all further proceedings, including entry of judgment. (*See* Doc. 32 [minute order].)

[2] *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998).

1  (OSC) in Writing Why Sanctions Should Not be Imposed for Plaintiff's Failure to File an

2  Opposition or Statement of Non-Opposition. (Doc. 45). Despite being directed to respond in

3  writing within 14 days, Plaintiff did not respond to the OSC. Thus, the Court considers

4  Defendants' summary judgment motion to be unopposed. *See* Local Rule 230(c).

5  ## II.    APPLICABLE LEGAL STANDARDS

6  ### *Motions for Summary Judgment*

7  Summary judgment is appropriate when it is demonstrated that there "is no genuine

8  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

9  Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by

10  "citing to particular parts of materials in the record, including depositions, documents,

11  electronically stored information, affidavits or declarations, stipulations (including those made for

12  purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R.

13  Civ. P. 56(c)(1)(A).

14  Summary judgment should be entered, after adequate time for discovery and upon motion,

15  against a party who fails to make a showing sufficient to establish the existence of an element

16  essential to that party's case, and on which that party will bear the burden of proof at trial. See

17  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an

18  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

19  *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party

20  to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec.*

21  *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). In attempting to establish the

22  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

23  of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

24  and/or admissible discovery material, in support of its contention that the dispute exists or shows

25  that the materials cited by the movant do not establish the absence of a genuine dispute. *See* Fed.

26  R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the

27  fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

28  governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *T.W. Elec. Serv.,*

*Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Further, the opposing party must also demonstrate that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

### *Eighth Amendment Failure to Protect*

Prison officials have a duty "to take reasonable measures to guarantee the safety of inmates, which has been interpreted to include a duty to protect prisoners." *Labatad v. Corrections Corp. of America,* 714 F.3d 1155, 1160 (9th Cir. 2013) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) & *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005)). To establish a violation of this duty, a prisoner must "show that the officials acted with deliberate indifference to threat of serious harm or injury to an inmate." *Labatad*, 714 F.3d at 1160 (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)).

A failure to protect claim under the Eighth Amendment requires a showing that "the official [knew] of and disregard[ed] an excessive risk to inmate ... safety." *Farmer*, 511 U.S. at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (citations omitted). The duty to protect a prisoner from serious harm requires that prison officials take reasonable measures to guarantee the safety and well-being of the prisoner. *Id.* at 832-33; *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). As "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," plaintiff must allege facts showing the defendant acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotations marks, emphasis, and citations omitted).

To state a claim, the Eighth Amendment requires allegations sufficient to plausibly show that prison officials were deliberately indifferent to a substantial risk of harm or safety. *Farmer*, 511 U.S. at 847. The objective component of an Eighth Amendment requires that a prisoner show he was deprived of something "sufficiently serious." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (quoting *Farmer*, 511 U.S. at 834). The state of mind requirement under the subjective component of the Eighth Amendment standard has been defined as "deliberate indifference" to an inmate's health or safety. *Farmer*, 511 U.S. at 834. Under the "deliberate indifference" standard, a prison official cannot be found liable for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety. *Id*. at 837.

### III.    PLAINTIFF'S CLAIMS

In his complaint, Plaintiff alleged as follows:

> Plaintiff contends Defendant Degough relayed false information to Wasco State Prison staff concerning the danger of carcinogenic water "filled with 1, 2, 3 Trichloropropane." Plaintiff asserts Degough failed to monitor the true risk of the dangerous toxin and failed to disclose the "truth of the risk of stomach ailments & risk of cancer." Plaintiff asserts Defendant Cronjager, as head of health and safety, "has a sworn duty to always second guess, investigate and go above & beyond" to ensure the water was not toxic or chemically contaminated. Plaintiff contends Defendant Shirley "is the overseer

4

1  of the prison's well being" and failed to implement a productive plan
2  to remedy the water problem. He contends due to "violation of their
   duty," his right to access clean drinking water has been violated.

3  Plaintiff further contends Defendant Shirley has "outlawed bottled
   water for sale" as an alternative to the contaminated and toxic water.
4  Plaintiff contends he is "forced to drink toxic water" as a result. He
   asserts "Wasco City & prison as well as Shafter drink water from
5  Well #1 & Well #2." Plaintiff contends Defendants Shirley and
   Cronjager "work & possibly live in Kern County" and have
6  knowledge of the toxic water from "constant news stories &
   magazine articles & newspapers reporting" about the state of the
7  water. Plaintiff asserts "the defendants all three knew about &
   continue to know about the toxic water in the Wasco State Prison."
8  Plaintiff states the City of Shafter was directed not to "drink any of
   this water" and that the "Wasco prison staff knows that it has been
9  failing a federal standard for 1, 2, 3 TCP toxin in the California
   systems for years now." He contends the prison "set a date from
10 December 2017 to fix this problem" within three years; however, the
   water contamination problem continues to plague Plaintiff and
11 inmates housed at Wasco State Prison "5 plus years later."

12 Plaintiff contends Wasco State Prison is required to provide he and
   other inmates with "CLEAN drinking water & not contaminated
13 water." He asserts Degough did not "follow the protocol & contact
   the warden about the true emergency of the contaminated water" at
14 Wasco. As a result, there has been "no approach to fix the water &
   that has physically hurt the inmate population." Plaintiff contends
15 Cronjager "appears to have transferred the known inmates that have
   contracted H-pylori[3] from this water & one inmate was transferred
16 to Lancaster medical prison & succumbed to the injuries this water
   caused him."

17
18 Lastly, Plaintiff contends he suffers from kidney irritation, stomach
   pain, body rashes and eye irritation. His limbs are numb, he cannot
19 walk at times, his skin burns, and his lungs burn and sting.

20 (*See* Doc. 8 at 3-5, fn. & internal citations omitted.)

21     **IV.    DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**[3]

22     Defendants submitted the following statements of undisputed facts:

23 [3] Because Plaintiff did not file an opposition, he neither admitted nor denied the facts set forth by Defendants as
24 undisputed nor filed a separate statement of disputed facts. Local Rule 260(b). A verified complaint in a pro se civil
   rights action may constitute an opposing affidavit for purposes of the summary judgment rule where the complaint is
   based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. *McElyea v.*
25 *Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); *cf. Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (in
   adjudicating summary judgment motion, court must consider pro se plaintiff's contentions in motions and pleadings
26 based on personal knowledge and attested to under penalty of perjury). Here, because Plaintiff has not complied with
   Rule 260(b), the Court deems Plaintiff to have admitted those facts not disputed by his complaint or other verified
27 submissions. *See, e.g., Beard v. Banks*, 548 U.S. 521, 527 (2006); *Brito v. Barr*, No. 2:18-cv-00097-KJM-DB, 2020
   WL 4003824, at *6 (E.D. Cal. July 15, 2020) (deeming defendant's undisputed facts as admitted after plaintiff failed
28 to comply with Local Rule 260(b)).

5

1     1. Plaintiff is a California inmate in the custody of the California Department of
2         Corrections and Rehabilitation (CDCR). Plaintiff has been incarcerated at Wasco State
3         Prison since April 2022 until July 2024.

4     2. Defendant Shirley was the Acting Warden of Wasco State Prison in November 2020
5         and the Warden from June 2022 to January 16, 2024.

6     3. Defendant Cronjager became Wasco State Prison's Associate Warden in 2013 and
7         retired on December 30, 2021.

8     4. At all relevant times, Defendant DeGough was the Correctional Plant Manager at
9         Wasco State Prison that oversees the maintenance of physical plant operations and
10        construction projects at Wasco State Prison.

11    5. 1, 2, 3 – Trichloropropane (TCP) is a manmade chlorinated hydrocarbon that is
12        typically used as an industrial solvent and as a cleaning and degreasing agent.

13    6. In 1992, TCP was added to the list of chemicals known to the State of California to
14        cause cancer under California's Safe Drinking [and Toxic Enforcement Act. In 1999,
15        the California State Water Quality Control Board established a 0.005 μg/L drinking
16        water notification level for TCP. This level was based on cancer risks derived from
17        laboratory animal studies as reviewed by the U.S. Environmental Protection Agency
18        (EPA). It is reasonably anticipated to be a human carcinogen per the U.S. National
19        Toxicology Program. The International Agency for Research on Cancer (IARC) has
20        also classified TCP as probably carcinogenic to humans based on sufficient evidence
21        of carcinogenicity in experimental animals. There have not been any human studies
22        evaluating the risk of TCP and cancer.][4]

23    7. There is no federal [maximum containment level or] MCL for TCP in drinking water,
24        but the U.S. Environmental Protection Agency requires many large water utilities to
25        monitor for TCP with a minimum reporting level of 0.03 ug/L. Some states have

---

[4] The language appearing within brackets was added as it appeared incomplete; the language was taken directly from the Declaration of Timur S. Durrani, M.D., M.P.H., at paragraph 16 on pages 4 and 5, as identified by Defendants in support of the undisputed fact asserted.

established their own MCLs. For example, Hawaii established a state MCL of 0.6 ug/L.

8.  In December 2017, a California regulation established a much more stringent MCL of 0.005 ug/L. The regulation went into effect on January 1, 2018. The regulation also required all water systems in California to conduct quarterly monitoring for TCP in water sources.

9.  Wasco State Prison's water was tested quarterly by an independent laboratory, Environmental Agricultural Analytical Chemists, as required by the regulation.

10. Since April 2022 (when Plaintiff arrived at Wasco State Prison), eight quarterly tests have been conducted, the latest in August 2024. [¶] The TCP levels were as follows:

|      | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|------|-------------|-------------|-------------|-------------|
| 2022 | .013-.023 ug/L | .014-.024 ug/L | .015-.023 ug/L | .010-.017 ug/L |
| 2023 | .008-.008 ug/L | .008-.011 ug/L | .007-.012 ug/L | .000 – .006 ug/L |
| 2024 | .000-0.00 ug/L | .009-.021 ug/L | .000 – .009 ug/L | N/A |

11. Notices reporting the independent laboratory's findings were posted throughout the institution for each quarter that the TCP levels in Wasco State Prison's water exceeded

1   the MCL.

2   12. The quarterly notices stated that Wasco State Prison's TCP levels do not present an

3       emergency and that inmates do not need to use an alternative source of water, like

4       bottled water.

5   13. The notices did not state that Wasco State Prison's specific TCP levels were high

6       enough to cause illness. The notices indicated that "some people who drink water

7       containing 1, 2, 3-trichloropropane in excess of the MCL over many years may have

8       an increased risk of getting cancer," and encouraged those concerned about other

9       health issues to consult a doctor.

10  14. Defendant DeGough was listed as the point of contact for more information.

11  15. Expert evidence shows that Wasco State Prison's TCP levels were and are not

12      dangerous.

13  16. Defense expert, medical toxicologist Timur Durrani, M.D., M.P.H, reviewed relevant

14      literature, Wasco State Prison's water records, Plaintiff's complaint, Plaintiff's

15      deposition transcript, and Plaintiff's medical records from October 2015 through July

16      2024.

17  17. There are no reports of acute or chronic medical conditions in scientific literature for

18      an 18-month exposure to the concentration of TCP reported in the water at Wasco

19      State Prison. Thus, Dr. Durrani opined that although Wasco State Prison's water

20      contained TCP concentrations above the MCL, acute and chronic medical conditions

21      are not expected to occur from exposure to TCP in Wasco State Prison's water from

22      January 2023 to July 2024.

23  18. Accordingly, Wasco State Prison's water has been safe to drink at all relevant times,

24      even when it was out of compliance with the new MCL.

25  19. Moreover, Wasco State Prison was never ordered to stop providing its water to

26      inmates or to provide an alternative source of water.

27  20. Plaintiff's alleged effects of kidney irritation, stomach pain, body rashes, or eye

28      irritation are not consistent with published scientific literature on TCP exposure.

21. Collins's health history before his exposure to TCP at Wasco State Prison included a right knee and ankle sprain.

22. After his alleged exposure, he was noted to have contracted COVID in August of 2022 and food poisoning in February of 2023. He was also reported to have gingivitis and tooth decay in August of 2024.

23. There is no medical record of Mr. Collins's alleged effects of kidney irritation, stomach pain, body rashes, or eye irritation at the time of or following the alleged exposure.

24. The evidence does not support Mr. Collins's claimed kidney damage, body rashes, eye irritation, liver pain, and unspecified chronic pain as being caused by exposure to TCP in Wasco State Prison.

25. Dr. Durrani calculated Plaintiff's maximum daily ingestion of TCP as 0.0000003628190217 mg/kg/day, based on Plaintiff's self-reported ingestion of 1.4 liters of water per day and body weight of 93.9 kg.

26. TCP's reference dose, meaning the estimated dose of daily oral exposure for a chronic duration that is likely to have no appreciable risk of deleterious effects, is 0.004 mg/kg/day.

27. Because Plaintiff's daily, chronic exposure dose of 0.0000003628190217 mg/kg/day is significantly lower[5] than the 0.004 mg/kg/day reference dose, Plaintiff's exposure to TCP between April 2022 and July 2024, would not be expected to have even a minimal risk of harmful effects during his lifetime.

28. As part of California's TCP MCL regulation, California designated Granular Activated Carbon (GAC) treatment as the best available technology for TCP removal.

29. Activated carbon treatment requires installation of several large vessels containing thousands of pounds of activated carbon.

30. As water passes through the vessels, the TCP attaches to the carbon granules and

---

[5] Plaintiff's daily, chronic exposure dose is nearly 4,000 times below the EPA's Reference Dose.

1    filters out of the water.

2    31. Defendant DeGough worked with the State Water Resources Board to come up with a

3        Corrective Action Plan, which included a Capital Outlay Budget Change Proposal to

4        install a GAC filtration system.

5    32. Wasco State Prison's Warden at the time, John Sutton, signed off on the plan, which

6        was submitted to the State Water Resources Board and submitted the GAC

7        construction project to the Facility Asset Management Branch on August 31, 2018.

8    33. According to the Capital Outlay Budget Change Proposal, the estimated cost of

9        installing the GAC system was $1,017,100.00.

10   34. Defendant DeGough did not participate further in planning or implementing the

11       Corrective Action Plan. Once the Corrective Action Plan was submitted, Defendant

12       DeGough had no authority to do anything regarding Wasco State Prison's water

13       supply except issue quarterly notices when the TCP levels in the water system

14       exceeded the MCL.

15   35. Between August 2018 and April 2021, the Facilities Management Group reviewed and

16       researched the proposed Corrective Action Plan.

17   36. On April 20, 2021, the Facilities Management Group received final drawings and

18       specifications approval and initiated the bid process for the proposed GAC system.

19   37. In September 2021, the Facilities Management Group submitted contract documents to

20       CDCR's Office of Business Services (OBS).

21   38. By May 5, 2022, CDCR accepted W.M. Lyles Construction's bid to install the GAC

22       system.

23   39. Construction began on November 1, 2022.

24   40. By July 24, 2023, foundation excavation, underground utilities, and piping installation

25       had begun.

26   41. By January 29, 2024, the cement foundation was completed, and the GAC vessels

27       were set with partial piping and valving. However, inclement weather delayed

28       completion of construction,

42. The influent and effluent piping was installed by April 24, 2024.

43. By August 7, 2024, the installation of Variable Frequency Drives was 80% complete with Variable Frequency Drives installation in progress.

44. As of August 4, 2024, the Variable Frequency Drives are operational, and the chlorination and bacterial testing of the GAC vessels and related piping has been completed. The GAC installation project was 80% complete with vessel loading and activation of the GAC system scheduled to follow.

45. Defendant Shirley had very little involvement or responsibility in responding to Wasco State Prison's TCP levels.

46. Defendant Shirley had no authority to authorize a project the size of the TCP removal plant.

47. When Defendant Shirley became the Acting Warden in November 2020, CDCR and Wasco State Prison had already determined that the best approach to bringing the water into compliance with the MCL would be to install the GAC system.

48. Defendant Shirley deferred to the expertise of Wasco State Prison's plant operations staff and CDCR staff on matters regarding TCP compliance. The staff working on the GAC project regularly reported the progress of the project to Defendant Shirley.

49. While she was acting Warden and Warden, Defendant Shirley and her staff transmitted quarterly water tests to the State Water Resources Board, posted quarterly notices required by regulation regarding the TCP levels, and provided annual consumer confidence reports regarding the quality of Wasco State Prison's water.

50. While Defendant DeGough was listed as the point of contact on the quarterly water notices to Wasco State Prison inmates, the notices are templates provided by the State Water Resources Board and the TCP levels are based on an independent laboratory's findings.

51. Moreover, Defendant DeGough did not relay false information about Wasco State Prison's TCP water levels and related risks.

52. Defendant Cronjager's responsibilities as Associate Warden included, but were not

1    limited to, supervising the overall operations of Wasco State Prison's physical plant.

2    53. However, Defendant Cronjager is not a water expert, and it was not part of his job

3    duties or responsibilities to investigate or second guess independent laboratory

4    findings or the State Water Resources Board's information concerning Wasco State

5    Prison's TCP levels. Further, he was not personally involved in the day-to-day

6    activities of plant operations staff he supervised. Rather, Defendant Cronjager relied

7    on their expertise to work with CDCR's Facility Planning, Construction and

8    Management division to come up with a plan to treat the water to bring it into

9    compliance with state regulation.

10   54. Defendants were not aware that Wasco State Prison's water presented any risk to any

11   inmate or staff.

12   55. Specifically, Defendants were informed by the State Water Resources Board that the

13   TCP levels in Wasco State Prison's water did not present a health concern.

14   56. Defendants Shirley and DeGough were never informed that Wasco State Prison's

15   water presented an immediate danger to Plaintiff or to any other inmate or staff while

16   it was out of compliance with the new MCL.

17   57. Defendant Cronjager retired from CDCR over a year before Plaintiff arrived at Wasco

18   State Prison. Defendant Cronjager had no duty to ensure that Wasco State Prison's

19   water did not present an immediate danger to Plaintiff during his incarceration at

20   Wasco State Prison.

21   58. Additionally, Defendants were never informed that an alternative water source was

22   necessary while the GAC filtration system was being designed and built.

23   59. There is no evidence that Plaintiff ingested or was exposed to toxic or harmful doses

24   of TCP from any source.

25   60. It is Dr. Durrani's expert opinion that Plaintiff did not become ill from ingesting or

26   being exposed to the TCP concentrations in Wasco State Prison's water, that his future

27   health will not be affected, and that he does not have any risk of developing the

28   diseases associated with TCP.

1    61. No doctor has ever diagnosed any of Plaintiff's claimed conditions as being caused by

2    TCP.

3    62. Collins has not seen a doctor for his kidneys.

4    (*See* Doc. 44-8 & Doc. 46-1 [Amended].)[6]

5    **V.    DISCUSSION**

6    Defendants contend they were not deliberately indifferent to the non-dangerous levels of

7    TCP in Wasco State Prison's water. (Doc. 44-1 at 13.) Specifically, they maintain the water did

8    not present a substantial risk of serious harm (*id*. at 14-16) and that they reasonably responded to

9    any risk posed by TCP (*id*. at 16-18). Lastly, Defendants argue they are entitled to qualified

10   immunity. (*Id*. at 18-21.) Plaintiff has not offered any opposition to Defendants' arguments.

11   Briefly stated, Defendants' evidence establishes that although the water at Wasco State

12   Prison exceeded the MCL for TCP in California, during the relevant period, the prison's water

13   was safe to drink. Further, Plaintiff's physical complaints are inconsistent with exposure to TCP.

14   And Plaintiff's maximum exposure during the relevant period was miniscule compared to the

15   dosage or amount considered likely to have even a minimal risk of harm. Concerning Defendant

16   DeGough, Defendants' evidence establishes that DeGough worked with various authorities to

17   address the TCP in the water at Wasco State Prison, and after the corrective action plan[7] was

18   approved in August 2018, DeGough issued quarterly notices when the TCP levels exceeded the

19   MCL, but he had no authority to take any further action. Concerning Defendant Shirley, the

20   evidence establishes that during Shirley's tenure, the corrective action plan was already in place

21   and approved. Shirley deferred to plant operations and other staff with expertise in TCP

22   compliance and transmitted and posted required notices and provided annual reports regarding

23   water quality of Wasco State Prison. As concerns Defendant Cronjager, the evidence reveals that

24   he was not personally involved in the TCP water remediation plan and relied on the CDCR's

25

26   [6] Hereafter "UDF" followed by the relevant number.

27   [7] The plan involved installation of a Granular Activated Carbon filtration system. Construction began on November 1, 2022, and was 80 percent complete as of August 7, 2024. (*See* Doc. 44-6, ¶¶ 9-11, 15-19 [Declaration of S. DeGough].)

28

experience and the approved plan to treat the water and to bring it in compliance with the state regulation. Additionally, Defendant Cronjager retired before Plaintiff arrived at Wasco State Prison. Further, the Defendants were not aware of any risk posed to inmates or staff by the water at Wasco State Prison, nor were they informed that an alternative source of water was necessary at the facility. Defendants were informed by the State Water Resources Board that TCP levels in Wasco State Prison's water did not present a danger.

The Court has reviewed all the evidence presented, including the supporting declarations of T. Durrani, H. Shirley, J. Cronjager, and Mohammad Iranmanesh. The Court concludes that Defendants' have presented evidence that Wasco State Prison's water did not present an objectively serious risk of harm. *See* UDF Nos. 10, 12-13, 15, 17,19, 25-27. Further, Defendants have presented evidence indicating that Plaintiff did not consult a physician concerning any kidney issues nor has any physician ever diagnosed the symptoms he allegedly suffered as being caused by consuming the water at Wasco State Prison. *See* UDF Nos. 58-61. Next, Defendants have presented evidence that they responded reasonably to any risk that TCP presented at Wasco State Prison. *See* UDF Nos. 10-13, 19, 28, 31-43, 45, 47, 50-51, 52-53, 55-57. In short, Defendants have met their initial burden by demonstrating there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Thus, the burden shifts to Plaintiff as the non-moving party to establish that a genuine issue as to any material fact actually does exist. *Matsushita*, 475 U.S. at 586. Plaintiff has failed to do so; he has tendered no evidence to support his claims in this action. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.

The assertions made in Plaintiff's complaint do not establish the existence of any factual dispute. *See* Fed. R. Civ. P. 56(c); *Beard*, 548 U.S. at 527; *McElyea*, 833 F.2d at 197-98. And Plaintiff has completely failed to offer proof concerning the essential elements of his Eighth Amendment failure to protect claims against Defendants. *Celotex*, 477 U.S. at 322; *see Farmer*, 511 U.S. at 832-33, 847; *Labatad*, 714 F.3d at 1160; *Foster*, 554 F.3d at 812; *Frost*, 152 F.3d at 1128. Plaintiff has not demonstrated, nor does it appear he could demonstrate, that Defendants knew of and disregarded an excessive risk to his health and safety. *Farmer*, 511 U.S. at 834.

In sum, on this record, no rational trier of fact would find for Plaintiff as there is no

genuine issue for trial in this matter. *Matsushita*, 475 U.S. at 587. Defendants are entitled to summary judgment.[8]

### VI.    CONCLUSION AND ORDER

Based on the foregoing, this Court **HEREBY ORDERS** that:

1.  Defendants' motion for summary judgment (Doc. 44) is **GRANTED**; and

2.  The Clerk of the Court be directed to enter judgment in favor of Defendants Shirley, DeGough, and Cronjager, and to close this case.

IT IS SO ORDERED.

Dated:  __June 5, 2025__

_____
UNITED STATES MAGISTRATE JUDGE

---

[8] Because the Court has found that Defendants are entitled to judgment on the merits, the Court does not reach Defendants' alternative argument that they are entitled to qualified immunity.

15